UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

            - v. -

DELA SAIDAZIM,

                 Defendants.

_____

21-cr-564 (WFK)

## SENTENCING SUBMISSION ON BEHALF OF DELA SAIDAZIM

Dated: December 4, 2023
      New York, New York

MORVILLO, ABRAMOWITZ
GRAND, IASON & ANELLO, P.C.

Robert J. Anello
Brian A. Jacobs
Joshua P. Bussen
565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (telephone)
(212) 856-9494 (facsimile)

*Attorneys for Defendant Dela Saidazim*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

DISCUSSION ................................................................................................................ 7

I.      FACTUAL BACKGROUND ........................................................................................ 7

    A.      Dela Moves to the United States as a Young Child ............................................ 7

    B.      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ........................................................... 7

    C.      Dela Works Her Way Through College While Supporting Her Mother .............. 10

    D.      Dela Moves to Russia To Care for Her Mother ................................................ 11

II.     THE OFFENSE CONDUCT ...................................................................................... 11

    A.      Dela Searches for a Job in Russia To Support Her Mother and Herself .............. 11

    B.      Dela Begins Working in a Call Center ............................................................ 11

    C.      Dela Becomes a Personal Assistant, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ... 12

    D.      Dela's Knowledge of the Company's Illegal Conduct and Her Limited Role ..... 14

        1.      Dela's Role Was Limited To Carrying Out the Express Orders of Superiors ................................................................................................... 15

        2.      Dela's Participation Was Limited in Time and She Did Not Share in the Profits ......................................................................................................... 16

III.    DELA EXPERIENCES UNCHARACTERISTICALLY SEVERE CONDITIONS IN DETENTION AT THE MDC AND ON HOUSE ARREST ............................................ 17

    A.      The Horrific Conditions at the MDC .............................................................. 17

    B.      Dela's Exceptionally Difficult Home Detention ............................................... 18

IV.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ............... 20

    A.      ▮▮▮▮▮▮▮▮▮▮▮▮ ........................................................................ 20

    B.      ▮▮▮▮▮▮▮▮▮ ................................................................................. 21

V.      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ............................................ 21

VI.     DELA'S ACCEPTANCE OF RESPONSIBILITY, REHABILITATION, AND FUTURE PLANS ................................................................................................................... 22

VII.    DELA'S DEVOTION TO HER FRIENDS AND FAMILY ............................................. 24

VIII.   THE SENTENCING GUIDELINES ................................................................. 26

IX.   A TIME-SERVED SENTENCE IS APPROPRIATE ....................................... 27

    A.   The Nature and Circumstances of the Offense Weigh in Favor of a Time-Served Sentence ........................................................................... 28

        1.   Dela's Role Was Minor—She Had No Decision-Making Authority and Acted Only at the Direction of Her Superiors ......................................... 28

        2.   Dela Joined the Company Without Unlawful Intent, and Stayed To Provide for Her Mother .............................................................................. 30

        3.   ███████████████████████████████ ███████████████████████ ............................. 30

        4.   Dela Did Not Share in the Profits ................................................ 31

        5.   The Guidelines—Particularly, the Enhancement for Loss Amount—Vastly Overstate the Seriousness of Dela's Offense ........................................... 32

    B.   Dela's History and Characteristics Weigh in Favor of a Time-Served Sentence ........................................................................... 35

    C.   A Time-Served Sentence Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense .................... 37

        1.   The Time Dela Spent in the MDC and on Home Confinement Has Already Provided "Just Punishment" for Her Offense ........................................... 37

        2.   A Time-Served Sentence Is Consistent with Other Sentences in Comparable Cases ................................................................................. 39

    D.   A Time-Served Sentence Would Afford Adequate Specific and General Deterrence ................................................................................... 42

    E.   A Time-Served Sentence Would Allow Dela To Continue ███████████ ████████████ Rebuilding Her Professional and Personal Life ................ 43

X.   THE COURT SHOULD NOT IMPOSE A FINE .......................................... 45

XI.   THE COURT SHOULD IMPOSE A HYBRID RESTITUTION ORDER .................... 46

CONCLUSION ........................................................................................ 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Algahaim*,
   842 F.3d 796 (2d Cir. 2016) ........................................................................27, 32

*United States v. Beylina*,
   No. 19-cr-00059 (SJ) (E.D.N.Y. 2019)...................................................................41

*United States v. Broderson*,
   67 F.3d 452 (2d Cir. 1995) ...................................................................................30

*United States v. Carpenter*,
   320 F.3d 334 (2d Cir. 2003) ..................................................................................37

*United States v. Chastain*,
   No. 22-cr-305 (JMF) (S.D.N.Y. 2023) ..................................................................41

*United States v. Corsey*,
   723 F.3d 366 (2d Cir. 2013) ..................................................................................32

*United States v. Doyle*,
   No. 19-cr-0057 (KAM) (E.D.N.Y. 2022) ..............................................................40

*United States v. Herbert*,
   902 F. Supp. 827 (N.D. Ill. 1995)..........................................................................31

*United States v. Johnson*,
   No. 16-cr-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018)................27

*United States v. Levenson*,
   314 F. App'x 347 (2d Cir. 2008) .....................................................................27, 33

*United States v. Lovato*,
   798 F. Supp. 2d 1257 (D.N.M. 2011)...............................................................44, 45

*United States v. Mullings*,
   131 F. Supp. 3d 1 (E.D.N.Y. 2015) .......................................................................36

*United States v. Morgan*,
   No. 19-cr-209 (RMB) (S.D.N.Y. 2020)............................................................37, 38

*United States v. Nachamie*,
   121 F. Supp. 2d 285 (S.D.N.Y. 2000) ...................................................................30

*United States v. Nauman*,
   No. 19-cr-272 (TJM) (N.D.N.Y. 2020) ...............................................................40

*United States* Ex Rel. *Hyun Yu v. NuCare Pharmacy W., LLC et al.*,
   No. 19-cv-6466 (EK) (E.D.N.Y.) .......................................................................42

*United States v. Ego Onaga*,
   No. 19-cr-061(WFK) (E.D.N.Y. 2022) ......................................................29, 39, 40

*United States v. Pangelinan*,
   No. 16-cr-1409 (S.D. Cal. 2021) .................................................................29, 40

*United States v. Pallowick*,
   364 F. Supp. 2d 923 (E.D. Wis. 2005) .................................................................44

*United States v. Rivers*,
   18-cr-192 (WFK) (E.D.N.Y. July 27, 2021)......................................................18, 38

*United States v. Scopinich*,
   No. 19-cr-00062 (FB) (E.D.N.Y. 2019) ...............................................................40

*United States v. Scott*,
   No. 20-cr-051 (WFK), 2023 WL 4758766 (E.D.N.Y. July 25, 2023).............................. Passim

*United States v. Steinberg*,
   No. 19-cr-00063 (NGG) (E.D.N.Y. 2020).............................................................41

*United States v. Thompson*,
   No. 18-cr-33 (NGG), 2022 WL 2186903 (E.D.N.Y. June 1, 2022) .........................................46

*United States v. Velazquez*,
   No. 16-cr-233 (AKH), 2017 WL 2782037 (S.D.N.Y. May 26, 2017) .......................................43

*United States v. Wilensky*,
   No. 15-cr-55 (WFK), 2022 WL 715550 (E.D.N.Y. Mar. 10, 2022)..........................................41

*United States v. Williams*,
   No. 21-cr-603 (VEC) (S.D.N.Y. 2023)................................................................41

*United States v. Yalincak*,
   30 F.4th 115 (2d Cir. 2022) ..........................................................................46

**Statutes**

18 U.S.C. § 3553 .................................................................................................... Passim

**Rules & Guidelines**

Fed. R. Crim. P. 49.1 ...................................................................................................19

U.S.S.G. § 2B1.1............................................................................................27, 33, 34

U.S.S.G. § 4C1.1.......................................................................................................26

U.S.S.G. § 5A .......................................................................................................27, 33

U.S.S.G. § 5C1.1...............................................................................................33, 34, 35

**Other Authorities**

2023 Amendments in Brief,
    United States Sentencing Commission (2023) ..........................................................42

Fifteen Years of Guidelines Sentencing,
    United States Sentencing Commission (Nov. 2004)...................................................43

Five Things About Deterrence,
    National Institute of Justice (May 2016) ...................................................................43

A Report on the Reform of Federal Sentencing for Economic Crimes,
    American Bar Association, Criminal Justice Section (Nov. 10, 2014) .............................1, 5, 34

## PRELIMINARY STATEMENT

This memorandum respectfully is submitted on behalf of Dela Saidazim, who will stand before this Court for sentencing on December 13, 2023. Dela is a young woman who consistently has strived to make something of herself despite unrelenting adversity. The filings to date tell the Court little about Dela as a person. Those documents reveal only that she worked in a call center and as a personal assistant for the head of a company involved in illegally obtaining reimbursement for non-opioid prescriptions. Dela is truly contrite and remorseful for her illegal role in this company's operations and submits this memorandum to provide a more complete picture of her background and the context for her actions that led to this low point in her life.

For all the extraordinary reasons set out below, including Dela's acknowledged "minor role" in the conduct involved, counsel respectfully suggests the Court should impose a sentence of time served, which is consistent with the ABA "Shadow Guidelines" range of 0-6 months (below the Guidelines range of 46-57 months).

The factors set out in Section 3553(a) of Title 18, United States Code, also support a time-served sentence for Dela. Most significantly, Dela's "history and characteristics" and limited role in the charged conduct weigh heavily in favor of leniency. ▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

1



The "nature and circumstances" of what the government and pretrial confirmed were Dela's limited participation in that conduct, PSR ¶ 24, however, favor leniency. The government and Probation Office both have acknowledged that Dela was a "minor participant" in the conduct, PSR ¶¶ 24-25, and the government agreed to reduced charges to allow Ms. Saidazim to plead guilty, *see* Indictment, Dkt. No. 29; Plea Agreement, Dkt. No. 153. Dela joined the company to provide for her mother and herself, and was initially unaware of its improper dealings. Her superiors at the company hid that conduct from her for months.



During this time in her life, ████████████████████████████, she became aware of the company's unlawful dealings. Unfortunately, she continued working as an assistant at the company—a decision that she now deeply regrets and for which she has fully accepted responsibility through her guilty plea. She stayed with the company, however, not to enrich herself—which she did not do—but to enable her to care for her mother.

A third superseding indictment, Dkt. No. 241 ("S3 Indictment"), unsealed by the government on November 7, 2023, reinforces that Dela's role was limited. The S3 Indictment names as defendants six individuals, including Dela's boss. *Id.* These individuals are alleged to have orchestrated and overseen the operation of the company's unlawful dealings by: overseeing the entire operation (Brian Sutton), overseeing call centers (Brycen Millett), submitting fraudulent requests for reimbursement (Anthony Santamaria), submitting fraudulent prescriptions to physicians for approval (Joshua Alegria), coordinating money laundering efforts, (Hershel Tsikman), and coordinating the purchase and operation of pharmacies (Hafizullah Ebady). *Id.* ¶ 11. The S3 Indictment alleges that these individuals engaged in the unlawful

3

conduct years before Dela started at the company, and continued after Dela's relatively short tenure there. *Id.* ¶ 9.

In contrast to these organizers of the company's unlawful actions, the S3 Indictment notes that Dela acted "at the direction of" her boss and others as a physician recruiter and "*personal assistant.*" *Id.* ¶ 11(g) (emphasis added). Whereas her co-defendants participated in the unlawful conduct for nearly 5 years and were "paid over $280 million," *id.* ¶ 25, Dela was with the company for just over two years, initially did not know the company was engaged in unlawful conduct, never shared in the profits, and made just a small salary totaling approximately $88,000 for over two years of work. Although not all of her salary could be said to have been derived from improper conduct, Dela already has, based on assistance from her family, voluntarily agreed to pay the government that amount in restitution. Dela expects that she will be able to make that payment ahead of her sentencing or upon exoneration of her cash bail, as her family has agreed that $88,000 of the cash bail may be provided to the government as restitution. Further, unlike her co-defendants, as the Probation Office notes, Dela always was a low-level employee who "had no decision-making authority" and at all times was "act[ing] at the direction of her co-conspirators" without an understanding of the full scope of the improper conduct. PSR ¶ 24.

Considering her limited role and that she did not share in any profits, Dela's Guidelines sentencing range vastly overstates the seriousness of her offense. As is discussed below, under Section 3553(a), Dela's limited salary—her gain—is a far better gauge of culpability than the over $25 million in losses attributable to the improper conduct of the co-defendants. If Dela's total salary of $88,000 were used to calculate the Guidelines range, her total offense level (after deductions) would be 8 (0-6 months' imprisonment). This is also the offense level called for by

the ABA "Shadow Guidelines." Dela's salary corresponds more directly with her personal

participation in the improper conduct and is a much better metric to measure her culpability.



The other Section 3553(a) factors likewise support a time-served sentence. No further

need exists for specific deterrence—Dela lacks any criminal history and is not at all likely to

reoffend. Any need for general deterrence will be satisfied by a time-served sentence, which

would recognize both the time Dela has already spent incarcerated in the Metropolitan Detention

Center ("MDC")—where she was subject to horrific conditions at the height of the COVID-19

pandemic, including being placed in solitary confinement with non-working toilets, *see infra*

Section III—and the uncharacteristically severe conditions of her two-and-a-half-year home

detention. Her home detention was especially difficult because, unlike the normal defendant

who is allowed to spend home detention with their family, Dela was isolated and alone for the

majority of her home detention and thousands of miles away from her mother and family.

Dela's case also compares favorably with many cases, discussed below, in which courts here and elsewhere have imposed time-served sentences for comparable or more culpable conduct.  As in these cases, a time-served sentence is sufficient but no greater than necessary.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

A sentence of time served would fulfill the goals of sentencing, in that such a sentence would be sufficient but no greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.

The Court should not impose a fine or further restitution because Dela already voluntarily agreed to pay as restitution the full amount she made as salary from the time she was with the company engaged in the improper conduct.  Dela is of limited means and has essentially no savings.  Dela's co-conspirators made hundreds of millions, whereas Dela did not share in the profits from the improper conduct.  PSR ¶¶ 15, 24.  Thus, the Court should not impose a fine and should enter a hybrid restitution order holding that the payment Dela already voluntarily agreed to make—the full amount she earned during her work for the company—satisfies her restitution obligation.

Weighing all the Section 3553(a) factors, a time-served sentence is appropriate.  Dela fully accepts responsibility for the fundamentally wrong decisions she made and is deeply sorry. Dela's desire is to be sentenced promptly and to move past this low point in her life, and to have the opportunity to start anew.  If not incarcerated, she hopes to have her mother move back to the

United States so that she can continue to care for her, and she wants to start a family with her partner, a dream she has put on hold until she puts this case behind her. For all these reasons, the Court should impose a sentence of time served.

## DISCUSSION

### I.   FACTUAL BACKGROUND

#### A.   Dela Moves to the United States as a Young Child

Dela, who is now 34, was born in the U.S.S.R. in what today is Kyrgyzstan in 1989. When Dela was two years old, her family moved to Moscow. During these early years, her family had constant financial issues and lived a meager lifestyle. By the late 1990s, after the fall of the Soviet Union, Moscow had become unsafe. After an incident in which bullets crashed through the window of the family home, Dela's parents moved their family to the United States.

From age six, Dela grew up in Long Island, New York. America became Dela's home. She attended Lawrence Woodmere Academy and then Hewlett High School. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

#### B.   ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮





---

### C.    Dela Works Her Way Through College While Supporting Her Mother

███████████████████████, Dela persevered to make something of her life.  She

obtained a GED, enrolled in a local community college, and in 2010 naturalized as an American

citizen.  After a year at community college, she enrolled at the University of Miami and, for the

first time, moved away from home.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████. In 2015, Dela

moved her mother to Miami to live with her in Dela's one-bedroom college apartment.  Although

many college-age students may not have been eager to have their mother living with them in a

one-bedroom apartment, Dela made this arrangement without hesitation.  ████████████████

███████████████████████████████████████████████████

████████████████████████████ Despite splitting her time between

attending classes, working, and caring for her mother physically and emotionally, Dela graduated

from the University of Miami in 2015 with a B.A. degree.

Although she had once planned to go to graduate school, she knew she needed to provide

financially for her mother.  To support them both, she deferred her own dreams and began

working full time at multiple jobs, including as an attendant at a juice bar and as an assistant in

Nordstrom's corporate office and at a dermatologist's office.  In 2016, Dela and her mother

decided that her mother should return to Russia, both because Dela expected her to have a

network of family and friends in Moscow to help care for her and because it would alleviate

some of their financial burden.  Dela helped move her mother to Moscow, and Dela returned to

live in New York. ████████████████████████

████████████████████████

### D.   Dela Moves to Russia To Care for Her Mother

Dela had hoped that being around a network of family and friends in Russia would be good for her mother.  Those individuals—including Dela's brother—however, did not provide the support Dela had expected and that her mother needed.  ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████.  Dela asked her mother to move back to the United States so she could take care of her.  Her mother declined.  Thus, Dela again put her mother's needs above her own.  She moved to Russia "temporarily" to help her mother while she figured out what to do next.

## II.   THE OFFENSE CONDUCT

### A.   Dela Searches for a Job in Russia To Support Her Mother and Herself

Dela moved to Russia in late 2018.  The transition was difficult because she had to leave her home, her friends, her job, and her support network.  She had to find a job to support her mother and herself financially, even though she speaks only conversational Russian and does not write well in the language.  These barriers made finding employment difficult.  ███████

████████████████████████████████  She applied to multiple jobs but was not hired, apparently due to her lack of Russian language skills.

### B.   Dela Begins Working in a Call Center

After over a month of searching, in December 2018, Dela saw an advertisement for an English-speaking position at a telehealth company.  She applied and was asked to interview.  At the interview, she was impressed by the large, modern office, the many employees, and the

11

company's corporate formalities.  The company provided formal tax paperwork (unlike many Russian companies) and had what looked like a functioning human resources department.

The head of human resources told Dela the company was owned by an American who moved to Russia, and that the company owned pharmacies in the United States.  Dela's job would be to work in a call center calling doctors who might work with the company.  Dela had no experience in the healthcare industry, but was told none was required.  After the interview, the company offered Dela a job with a salary of around $1,200 per month.  Although this amount would barely be enough to support her mother and herself, Dela needed a job, so she accepted.

She started working in January 2019.  At this point, Dela did not know that the company was anything but what it said it was:  a legitimate telehealth company that connected patients with physicians in the United States and provided prescriptions through its network of brick-and-mortar pharmacies.  The company provided Dela with a script and instructed her to follow it.  Dela called doctors after they responded to advertisements posted by the company on bona fide recruiting websites, such as Ziprecruiter.com, followed her script, and, if she found an interested doctor, would pass that doctor's information along to others at the company.

### C.     Dela Becomes a Personal Assistant, ███████████████████

Dela performed well in the call center particularly because she spoke perfect English without an accent.  After almost three months at the company, Dela was asked if she wanted to become the personal assistant to the founder of the company and offered a pay raise to about $3,200 per month. ███████████████████████████

███████████████████████████████

████████████████████████

12

████████████████████████████████ Because of Dela's lack of experience and

understanding of the business, she was given little to no discretion regarding her assigned tasks.

Each day, Dela was given a detailed daily to-do list, such as arranging for her boss's travel and

buying gifts.  Other tasks related to pharmacies in the United States the company owned, but

generally were limited to passing verbatim messages from her boss to others.

13



**D.      Dela's Knowledge of the Company's Illegal Conduct and Her Limited Role**

As noted in the S3 Indictment, others at the company apparently had been engaged in illegal conduct long before Dela started working there.  They hid the illegal nature of the company from her for months.  Over the course of Dela's work as an assistant, however, she became aware that the prescriptions for which the company was billing insurers—which were

not opioids or other harmful drugs—were not consistent with the patients' needs. Dela said
nothing and continued her work as an assistant—a decision she deeply regrets.

Even so, Dela was never more than an assistant and low-level employee who "had no
decision-making authority" and acted "at the direction of her co-conspirators" without
understanding the full scope of her co-conspirators' conduct. PSR ¶ 24. In recognition of her
limited role, the government and Probation Office have both agreed that a minor role adjustment
to the Guidelines range is warranted. PSR ¶ 24. Indeed, the Probation Office—without
objection from the government—noted that Dela was "a minor participant" and that thus "a 2-
level role reduction is" appropriate. PSR ¶ 25.

### 1. Dela's Role Was Limited To Carrying Out the Express Orders of Superiors

At all relevant points, Dela acted "at the direction of" her boss as a doctor recruiter and
"personal assistant," carrying out his directions and transmitting his messages to others without
independent decision-making authority. S3 Indictment ¶ 11(g). For example, Dela
"communicated the directions of the scheme leaders, including directing the actions of others in
connection with the purchase and operation of pharmacies." PSR ¶ 6. At the direction of her
superiors, she sent messages to others to "assist[] with the setup of the Scheme Pharmacies,"
including pharmacies in Brooklyn, New York. PSR ¶ 22. She also aided her superiors in
making sure the U.S.-based pharmacies had "adequate staffing" and "bank accounts set up to
facilitate the international wiring of funds." PSR ¶ 22. She requested copies of checks and
passed those checks to her superiors so that they could keep track of money the pharmacies
received from insurance companies. PSR ¶ 22. She also, at times, coordinated with doctors who

responded to online job postings and served as an initial point of contact before passing

interested doctors to her superiors. PSR ¶¶ 17-18.

Dela's role remained limited throughout her time with the company. PSR ¶ 24. An

exchange in February 2021—over two years after she joined the company—shows that Dela was

still acting only as a go-between for her boss and others. Another employee sent her an email

about an insurance claim. Dela forwarded the email to her boss. Her boss dictated the exact

language he wanted as a response. Dela passed the audio dictation to the other employee. That

employee then wrote and sent the dictated response. Dela's boss then asked for a copy of the

message, apparently because he did not trust her independently to pass along his dictation.

Dela's boss often dictated such messages and then required her to show him the draft messages

before allowing her to send them. He also consistently required that Dela record phone calls so

that he could listen to them later and affirm she was carrying out his instructions.

████████████████████████████████████████

██████████████████████████████████████. He sent

many messages to her containing question marks, apparently because he wanted a quick reply.

Because Dela was not privy to the log-in information he wanted, she replied that she would

"double check with [another employee]" to obtain the requested log-in information—making

clear that she was acting merely as an intermediary between her boss and others at the company.

### 2. Dela's Participation Was Limited in Time and She Did Not Share in the Profits

The other defendants were apparently engaged in unlawful conduct by 2017, years before

Dela started at the company. S3 Indictment ¶ 9. Dela was at the company for just over two

years, although she was not aware of the improper conduct of the company for that entire time

16

because her boss and others initially hid that fact from her. Further, the other defendants continued the unlawful conduct after Dela left the company. *Id.*

Unlike the other defendants here, who were "paid over $280 million" from the unlawful conduct, *e.g.*, S3 Indictment ¶ 25; PSR ¶ 15, Dela made nothing beyond her small salary, PSR ¶ 24. All in, she was paid a total of approximately $88,000 for over two years of work. She did not earn a single dollar of the company's profits or receive bonuses based on the company's performance. As explained below in Section XI, Dela voluntarily has agreed to pay the government the full $88,000 in restitution.

## III. DELA EXPERIENCES UNCHARACTERISTICALLY SEVERE CONDITIONS IN DETENTION AT THE MDC AND ON HOUSE ARREST

### A. The Horrific Conditions at the MDC

After being arrested on June 8, 2021, Dela spent almost three weeks at the MDC during the COVID-19 pandemic. Because of COVID-19 restrictions, the MDC placed Dela in the special housing unit ("SHU") for the entirety of her time at MDC. During that time, the conditions of that unit were even harsher than normal. She was in solitary confinement 24/7, not allowed recreational time, and required to eat all meals alone in her cell. She could shower only once every three days and could not buy soap or shampoo because commissary workers were on strike. At one point the AC/heating units malfunctioned, which during June in Brooklyn made the conditions almost unbearable.

These issues were compounded when the toilets in the SHU became clogged. To avoid having excrement sit in her toilet, Dela restricted her bowel movements for days, but eventually could not hold out any longer. The toilets would stay clogged for approximately a week, during which the smell was putrid. Dela had to sleep directly next to the toilet and drink from the sink

17

connected to that toilet.  In protest for the way she was being treated, one woman would scream for hours during the night making it impossible for Dela to sleep.  Dela and others complained repeatedly to the guards about the toilets, and the guards were aware also because they would come into Dela's cell, at least weekly, to force her to strip to check for contraband.[2]

The solitary confinement and problems with the toilets were not the only traumatic experiences Dela had at the MDC.  When Dela was finally set to be released, an inmate in the SHU committed suicide in his cell.  The guards walked Dela past this inmate's cell, causing her to see his dead body—the first dead body she had ever seen.[3]

## B.   Dela's Exceptionally Difficult Home Detention

After Dela was released from the MDC, she spent the next two and a half years under strict conditions of release including home confinement.  She spent the majority of her time in isolation separated from her mother, family, and boyfriend.  She and her boyfriend also have put their dreams of having a family on hold because they do not want to start a family before these proceedings are concluded.

For the first 15 months after she was released from the MDC, Dela was on strict home confinement in her apartment.  She could leave only on limited occasions, such as to go to her attorneys' office.  Her home detention, in effect, put her back in a form of solitary confinement for lengthy periods.  She currently has no family living here in the United States and was cut off from others in her support system, including her boyfriend who lives in Florida.

---

[2] The problem with MDC's toilets was raised to this Court's attention in a different case about a month after Dela was released.  In *United States v. Rivers*, 18-cr-192 (WFK) (E.D.N.Y. July 27, 2021) (Kuntz, J.) (Dkt. No. 134), defense counsel notified the Court that her client was experiencing similar issues with the toilets in the MDC.  *Id.* at 4.  In response, this Court stated that "the situation at the MDC "is a disgrace," "an ongoing disgrace."  *Id.* at 7.

[3] *See Ex-DEA Inmate Died In MDC Day After Guilty Verdict Now Ruled Suicide So Case Closed*, Inner City Press (Nov. 5, 2021), https://www.innercitypress.com/sdny39mschofieldrakoffdeapornicp110521.html.

Despite being on strict home confinement, Dela found a job. In September 2022 the Court modified her conditions to permit her to leave home solely for work. Later, in March 2023, nearly two years after she had been arrested and after she pled guilty to reduced charges, the Court converted Dela's home confinement to a curfew. Her curfew remains in place now and restricts her to her home from 8:00 P.M. to 8:00 A.M. on weekdays and 8:00 P.M. to noon on weekends.



As noted by Jessica Kuncman, "[Dela] is [her mother]'s entire world and vice versa"—"time apart has been unbearable for both of them." Ex. 7, J. Kuncman Letter at 2.

Despite the extraordinary difficult time Dela has had under these conditions, she has exhibited exemplary behavior and "complied with all Court-ordered conditions of release." PSR ¶ 2. The Court has allowed Dela to leave her home for certain holidays and events. The Court allowed her to travel to Pennsylvania for the high school graduation of I.C. I.C. is the daughter of Dela's godmother. I.C. attended high school in the United States and was separated from her mother, who lives in Eastern Europe. Dela was thankful to be able to make the trip to the graduation because I.C.'s family could not make the trip to the United States for the graduation, and Dela wanted to make sure that someone was there to support her.[4] On two occasions, the

---

[4] I.C. is a minor. Thus, only her initials are provided in this memorandum. *See* Fed. R. Crim. P. 49.1.

Court has also allowed Dela to travel to Florida for work—once for a week and once for two

weeks—during which time she was on stand-alone monitoring.  Each time, Dela has returned

home without incident.





**B.**

**V.**

21



## VI. DELA'S ACCEPTANCE OF RESPONSIBILITY, REHABILITATION, AND FUTURE PLANS

Dela was the first defendant to plead guilty, before the Court had set a trial date or ruled

on her pretrial motions.  Dela's early plea demonstrates her desire to accept responsibility and



move forward with a productive life, caring for her mother, and forming her own family. At and after her plea, she has shown true remorse for the actions that have led her to this low point in her life. As she notes in her letter to the Court:

> I first want to personally tell you and everyone who was harmed by my actions how deeply sorry I am. The shame, guilt, and sadness I have felt over the last years has been overwhelming. I am very embarrassed and disgusted with myself knowing that I was a part of something that wrongfully took money from others, and that it has required so much time and effort from the Court, the prosecutors, and my attorneys.

Ex. 1, D. Saidazim Letter at 1.

Since Dela's arrest, she has taken many steps to move forward with her life. She found employment, and works for a company that provides services to the hospitality industry. In a letter from her boss, he states that Dela is hard working and has been an "incredible asset" as she has gone "above and beyond to help [him] navigate the challenges of maintaining the business." Ex. 4, C. Auguet Letter at 1. Her boss notes that he has committed to providing a position to Dela after this case is concluded. Ex. 4, C. Auguet Letter at 2.



Dela also has started making plans for her future. Her most immediate concern is to provide care for her mother, and hopes to bring her mother back to the United States. She hopes also to start her own family with her boyfriend, and has acted to preserve the chance to be a mother herself, including by oocyte cryopreservation (egg freezing). She hopes one day soon to have children and provide a stable and loving life for them.

## VII.   DELA'S DEVOTION TO HER FRIENDS AND FAMILY

The letters from Dela's close friends and her mother—who is the only relative with whom she remains close—provide the best insight into who Dela is as a person.  The letters demonstrate that despite the adversity she has faced in her own life, she is always quick to offer help to others.  The letters further show that Dela has exhibited a lifelong commitment to caring for her mother and that she has repeatedly put her mother's needs above her own.

Dela's current employer notes that Dela is the type of person who would "take the shirt off of her back for anyone in need."  Ex. 4, C. Auguet Letter at 1 (quotation marks omitted).  Other letters reinforce Dela's employer's conclusion.  When Doreen Caulo's sister was dying, Dela volunteered to "stay[] at [her] apartment with her and [feed] her"; Dela "held her hand" and "sat in the nursing home" with her so she would not be alone.  Ex. 5, D. Caulo Letter at 2.  When I.C. moved to the United States and was away from her family in Eastern Europe, Dela became her de facto "aunt"—helping her with her schoolwork and being a constant source of support even while Dela was on house arrest.  Ex. 9, I.C. Letter at 2-3.

The letters detail many more acts of kindness:   Dela "has always been there for me whether I needed a shoulder to cry on," Ex. 10, N. Holder Letter at 1; Dela "helped me pack up and gather" my mother's things when she passed away, Ex. 5, D. Caulo Letter at 2; Dela provided me with "remarkable support and love . . . during my post-partum period," Ex. 8, D. Elliott Letter at 1; "when I was in a difficult situation with my job, . . ." Dela "loan[ed] me $1,500 to cover my rent," Ex. 11, A. Ward-Quick Letter at 1; when "I got pregnant with my daughter," during the COVID pandemic Dela "was checking in on me daily and always made sure I was ok," Ex. 6, G. Caulo Letter at 1.

24

As the letters make clear, however, Dela's kindness is limited neither to her long-time friends and family nor to grand gestures. For example, Karl Briggs, the concierge at the building in which she stayed for much of her pretrial confinement, wrote a letter in support of Dela, noting that she is a "kind" and "warmhearted" woman who would do little things to cheer him up if he was having a bad day, like bringing him "Venti French Vanilla Latte[s]" and listening to his dilemmas and challenges. Ex. 12, K. Briggs Letter at 1.

Many letters also recount Dela's devotion to caring for her mother, who Dela has supported "emotionally, financially, and physically" on her own for years. Ex. 9, I.C. Letter at 3. Dela began caring from her mother at a very young age, as noted by Jessica Kuncman, who met Dela in the 7th grade during recess:

> Dela always put her mother first before any personal problems and social events throughout her entire life. As [Dela] got older more and more responsibilities fell onto her. She not only takes care of [her mother] emotionally but also financially. Dela makes sure everything from food and medicine to having a roof over her mother's head is taken care of.

Ex. 7, J. Kuncman Letter at 2.



Danielle Elliott, a college friend, similarly describes how Dela took care of her mother during college: "[Dela's] mom lived with her and Dela took care of her even while continuing with her

---



classes and working. Dela's father and brother did not help with Dela's mother, and I remember Dela telling me that if she didn't take care of her mother, no one would because her mother had no one else. Even after Dela's mother moved to Russia, Dela would still send her money and make sure she was being taken care of." Ex. 8, D. Elliott Letter at 2.

Doreen Caulo and I.C. both describe how Dela has continued to care for her mother even while she goes through these criminal proceedings. I.C. notes that "[e]ven in the last couple of years, with this case hanging over her head and when she is the one who needs support, [Dela] takes care of her mother by making sure that food is being delivered to her and that people are going to her mother's house to check on her and to make sure she, the pets, and the house are okay." Ex. 9, I.C. Letter at 3-4. ███████████████████████████████ ████████████████████████████████████████████ At bottom, Dela's loved ones all recognize that "[Dela] is [her mother's] entire world and vice versa." Ex. 7, J. Kuncman Letter at 2.

On the whole, the letters to this Court from Dela's family and friends speak volumes about her character, and fully support a time-served sentence.

## VIII.   THE SENTENCING GUIDELINES

Dela's advisory Sentencing Guidelines range is 46 to 57 months. Both the plea agreement and the Presentence Report calculate a Guidelines range of 57 to 60 months, but the government and Probation Office both agree an additional two-level decrease is warranted because after the plea agreement was signed and after the Presentence Report was prepared, the United States Sentencing Commission amended Section 4C1.1, which provides a two-level decrease for first time, nonviolent offenders. Accordingly, Dela's adjusted offense level should be 23, which results in an advisory Guidelines range of 46 to 57 months.

26

As explained below, however, even this reduced Guidelines range—which is driven largely by the profits made by her boss and others, in which she did not share—seriously overstates the seriousness of Dela's offense. In light of her minor role as an assistant who carried out her boss's orders, Dela's limited salary—her gain—is a better gauge of culpability than the over $25 million in losses attributable to the improper conduct. If her total salary, $88,000, were used to calculate the Guidelines range under Section 2B1.1, Dela's total offense level after deductions would be 8, with a recommended sentence of 0-6 months' imprisonment, placing her in Zone A of the sentencing table where a non-custodial sentence would be presumptively appropriate. Dela's salary corresponds more directly with her personal participation in the improper conduct and is a much better metric to measure her culpability. The Second Circuit has made clear that district courts should look to the defendant's individual characteristics and consider a non-Guidelines sentence in cases like Dela's where "'the significant effect of the loss enhancement' is not in proportion to 'the low base offense level.'" *United States v. Johnson*, No. 16-cr-457-1 (NGG), 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018) (quoting *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016); *see United States v. Levenson*, 314 F. App'x 347 (2d Cir. 2008) ("[L]oss amount of $40 million 'overstate[d]' the seriousness of Levenson's role in the offense since Levenson never received any benefit from the fraud apart from his own salary"). Thus, a sentence of time served remains appropriate.[7]

## IX.   A TIME-SERVED SENTENCE IS APPROPRIATE

The Section 3553(a) factors weigh heavily in favor of leniency, and lead to the conclusion that a time-served sentence is sufficient but no greater than necessary.

---

[7] The plea agreement permits Ms. Saidazim to argue that the Court should impose a sentence below the Guidelines range.

A.     The Nature and Circumstances of the Offense Weigh in Favor of a Time-
       Served Sentence

The "nature and circumstances" of Dela's offense weigh in favor of a time-served

sentence. 18 U.S.C. § 3553(a)(1).

1.     Dela's Role Was Minor—She Had No Decision-Making Authority and
       Acted Only at the Direction of Her Superiors

Dela's minor role as a low-level personal assistant supports a time-served sentence. The

government has recognized that Dela had minor role in the charged conspiracy, PSR ¶ 36, which

began years before she joined it and continued after her arrest, S3 Indictment ¶ 9.

Dela joined the company without any knowledge of its illegal dealings. Her boss and co-

defendants initially hid the illegal nature of the company's business from her for months. She

was hired to work in a call center recruiting doctors. Later, she became a personal assistant to

the head of the company. Months after that, she became aware of illegal conduct at the

company. Even then, however, she acted only at the express direction of her superiors. She

"communicated *the directions of the scheme leaders*, including directing the actions of others in

connection with the purchase and operation of pharmacies," PSR ¶ 6 (emphasis added), "*assisted*

with the setup of the Scheme Pharmacies" relating to staffing and making sure bank accounts

were set up, PSR ¶ 22 (emphasis added), and "acted *at the direction of her co-conspirators*" by

coordinating with doctors and requesting copies of checks, PSR ¶¶ 17, 22, 24 (emphasis added).

Dela's participation also was limited in time. The improper conduct began before she

started working for the company. She initially was unaware of the company's improper conduct,

and she quit the company— ████████████████████████ —for a

period of over three months. Dela's limited participation—both in her minor role and the limited

time she engaged in the conduct—militates in favor of a time-served sentence.

28

This Court and others have sentenced equally or more culpable defendants to time-served sentences. For example, in *United States v. Ego Onaga*, No. 19-cr-061(WFK) (E.D.N.Y.) (Kuntz, J.) (Dkt. Nos. 89, 93), the defendant was a therapist who billed for care under the New York State Early Intervention Program ("EIP"), a New York State program that provided remedial services to developmentally delayed children. Dkt. No. 89, at 1. Whereas Dela acted as an assistant at the directions of others and did not share in any profits, the defendant in *Onaga* personally "submitted at least 600 fraudulent session notes for non-existent EIP therapy" over a four-year period, deprived "26 separate children of the EIP therapy sessions to which they were entitled," and personally made more than $60,000 in improper benefits. *Id.* at 2, 4. This Court sentenced the defendant to two years' probation. Dkt. No. 93.

In *United States v. Pangelinan*, No. 16-cr-1409 (S.D. Cal.) (Dkt. No. 537), the defendant participated in a scheme to fraudulently obtain money from health care benefit programs by bribing doctors to induce patients to purchase certain pharmaceuticals and other goods and services from entities owned by one of the co-conspirators. *Id.* at 12. Like Dela, he was not an organizer of the scheme but, rather, served as a "marketer" by recruiting doctors to prescribe high priced medications, often in exchange for a kickback. *Id.* at 11-12. The defendant received personally at least $126,808.42. *Id.* at 5, 20. Noting that, as a doctor recruiter, the defendant was less culpable than the organizer of the scheme, the court sentenced him to time served and two years' supervised release including 10 months of home confinement, despite a Guidelines range of 51 to 63 months' imprisonment. *Id.* at 17. Here, Dela's role as a personal assistant with no decision-making authority was even more limited than the defendants' roles in the conduct at issue in *Onaga* and *Pangelinan* and, unlike those defendants, Dela did not share in any profits.

Many other examples of more or equally culpable defendants receiving time-served or noncustodial sentences are provided below in Section IX.C.2. These cases reaffirm that a time-served sentence is appropriate here.

### 2. Dela Joined the Company Without Unlawful Intent, and Stayed To Provide for Her Mother

Dela joined the company without intending to engage in wrongdoing. The Second Circuit has endorsed downward departures under similar circumstances, when individuals joined an operation without criminal intent. In *United States v. Broderson*, 67 F.3d 452, 459 (2d Cir. 1995), the Circuit upheld the district court's downward departure in a case in which the district court found that the defendant did not initially intend to engage in illegal conduct, although he later did. *Id.* In endorsing the departure, the Circuit noted that the defendant's lack of initial intent to engage in wrongdoing made him "significantly different from that of the typical fraud defendant." *Id.*; *see also United States v. Nachamie*, 121 F. Supp. 2d 285, 297 (S.D.N.Y. 2000). Similarly, Dela did not set out to engage in criminal conduct, and even after she found out about the illegal conduct, her motivations for staying at the company were distinguishable from those in cases with longer sentences. Rather than wanting to enrich herself, Dela wanted to remain employed to provide for her mother. These facts support imposing a time-served sentence.

### 3.



███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

A sentence of time-served would track this Court's prior decisions.  In *United States v. Scott*, No. 20-cr-051 (WFK), 2023 WL 4758766 (E.D.N.Y. July 25, 2023) (Kuntz, J.), this Court addressed a similar situation.   There, the defendant was convicted of conspiring to defraud investors in a Sandy Hook Benefit Concert.  *Id.* at *1.  The defendant's advisory sentencing range was 15 to 21 months.  *Id.* at *5.  Although the conduct was "serious," Your Honor sentenced the defendant to time served and supervised release, ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█ *see also United States v. Herbert*, 902 F. Supp. 827 (N.D. Ill. 1995).

### 4.    Dela Did Not Share in the Profits

That Dela did not share in the profits from the improper conduct emphasizes her limited role and similarly favors a time-served sentence.  Unlike her co-defendants, who were "paid over $280 million" by insurance companies, S3 Indictment ¶ 25, Dela did not earn any share of the profits, PSR ¶ 24.  Those profits went entirely to co-conspirators.  She was paid only a minimal salary.  All in, over a more than two-year span, Dela earned a total of approximately $88,000, not all of which is attributable to criminal activity.  She spent months working at the company without any knowledge of illegal activity.  Her job entailed legitimate tasks for a personal assistant—such as arranging for her boss's travel or buying gifts for his family.  Her limited salary—the full value of which she has voluntarily agreed to pay as restitution—and lack of

share in the profits confirm her diminished culpability and are factors that favor a time-served sentence.

### 5. The Guidelines—Particularly, the Enhancement for Loss Amount—Vastly Overstate the Seriousness of Dela's Offense

The Second Circuit has recognized the inordinate emphasis the Guidelines put on loss amount. In *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016), the loss amount under the Guidelines increased the two defendants' base offense levels from 6 to 16 and 18. *Id.* The Second Circuit noted the "unusualness" of the Guidelines' fixation on loss amount, and remanded the case to the sentencing judge for the court to consider "whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence." *Id.* Similarly, in *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) (2013), District Judge Stefan Underhill, who was sitting on the Second Circuit Court of Appeals, stated that "district judges have an *obligation* to consider whether to depart from the Guidelines sentencing range or to impose a non-Guidelines sentence *in every case*," and that "[t]hat duty will frequently require judges applying the loss guideline to evaluate whether the calculated Guidelines range substantially overstates the seriousness of a crime." *Id.* at 382 (emphasis and alteration added).

Dela's Guidelines sentencing range vastly overstates the seriousness of her offense. The Guidelines range here is driven almost entirely by the losses attributable to the improper conduct. Before applying any reductions, 22 of the 30 total offense levels are attributable to loss amount. The loss amount is an inadequate measure for Dela's culpability.

Under Section 3553(a), Dela's limited salary—her gain—is a far better gauge of culpability than the over $25 million in losses attributable to the improper conduct.[8]  In *United States v. Levenson*, 314 F. App'x 347 (2d Cir. 2008), the Second Circuit endorsed a reduced sentence under similar circumstances.  There, the court affirmed the judgment of the district court, which had reduced the defendant's sentence because the loss "'overstate[d]' the seriousness of [the defendant's] role in the offense since [he] never received any benefit from the fraud apart from his own salary."  *Id.* (first alteration in original).

If Dela's total salary of $88,000 were used to calculate the Guidelines range under Section 2B1.1, Dela's total offense level (after deductions) would be 8 (0-6 months' imprisonment), placing her in Zone A of the sentencing table.  With an offense level in Zone A and no criminal history, a non-custodial sentence would be presumptively appropriate under the recently amended application note 10(a) to Section 5C1.1.  Dela's salary corresponds more directly with her personal participation in the improper conduct and is a much better metric to measure her culpability.

Even with Dela's offense level in Zone D of the Sentencing Table, the newly amended Application Notes to Section 5C1.1 state that a departure to a sentence other than a custodial sentence is appropriate where "the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense."  U.S.S.G. § 5C1.1 application note 10(b).  Here, Dela did not engage in a crime of violence and the characteristics of her "individual contribution to the offense" show that she

---

[8] Dela agreed in her plea agreement that the loss amount for Guidelines purposes is over $25 million. Nonetheless, her gain from the time she participated in the offense conduct is a more appropriate metric for measuring her culpability in connection with the Section 3553(a) factors.

was not engaged in an "otherwise serious" offense. *See* The Reform of Federal Sentencing for Economic Crimes at 6, Am. Bar Ass'n, Crim. Justice Section (Nov. 10, 2014).[9] These new application notes also confirm that a time-served sentence is appropriate.

A calculation of Dela's offense level using the American Bar Association ("ABA") Criminal Justice Section Task Force's guidelines—referred to colloquially as the "Shadow Guidelines"—likewise confirms that the loss amount here overstates the seriousness of Dela's offense. *See id.* Under those Shadow Guidelines, Dela's total offense level would be 8. With an offense level of 8, the sentencing range would be 0-6 months and a non-custodial sentence would be "generally appropriate." U.S.S.G. § 5C1.1 application note 10(a).[10]

Finally, a departure is warranted here because the losses are "substantial but diffuse" and thus the loss "substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1, application note 21(C). The Presentence Report calculates the loss based on audit letters from a variety of benefit managers on behalf of an unidentified number of health insurance providers. PSR ¶¶ 23, 25. The government has not provided a list detailing a list of the individualized losses, PSR ¶ 27, but it is likely that the losses identified in the Presentence Report qualify as "substantial but diffuse," *see* U.S.S.G. § 2B1.1, application note 21(C).

For these reasons, the loss amount (and the Guidelines range) substantially overstates the seriousness of Dela's offense. The Shadow Guidelines range of 0-6 months better reflects "the

---

[9] https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf.

[10] Under the Shadow Guidelines, the base level would be 6; 12 levels would be added for losses over $10 million; 10 levels would be deducted for "lowest culpability"; and 0 points would be added for victim impact. Additionally, the Shadow Guidelines would, in any event, cap Dela's offense level at 10. *See* The Reform of Federal Sentencing for Economic Crimes at 2, Am. Bar Ass'n, Crim. Justice Section (Nov. 10, 2014).

nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), and the amendments to

Section 5C1.1 of the Guidelines confirm that a time-served sentence is appropriate.

### B.   Dela's History and Characteristics Weigh in Favor of a Time-Served Sentence

Dela's "history and characteristics" contain extensive mitigating factors.  18 U.S.C.

§ 3553(a)(1).  ████████████████████████████████████ .  Yet, rather than becoming

jaded, closed-off, or selfish, Dela exhibits compassion and selflessness.  Before and during the

events that brought her before this Court, she has led a quiet existence with the paramount goal

of caring for her mom.  ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████  This Court and others have sentenced

defendants to time served to avoid harming innocent family members who depend on the

defendant.  For example, in *United States v. Scott*, No. 20-cr-51 (WFK), 2023 WL 4758766

(E.D.N.Y. July 25, 2023) (Kuntz, J.), the defendant was divorced and had an approximately 11-

year-old child.  *Id.* at *3.  This Court stated that "courts should consider the impact a sentence

has on children who rely on their parents who are subject to terms of incarceration," and

sentenced the defendant to two years' supervised release despite a Guidelines sentence range of

15 to 21 months. *Id.* at *4-8. Similarly, in *United States v. Mullings*, 131 F. Supp. 3d 1 (E.D.N.Y. 2015), Judge Weinstein held that a "a custodial sentence [wa]s unnecessary" because the defendant's criminal conduct appeared to be an "'aberration' from his otherwise lawabiding life" and "[a] custodial sentence [would] cause hardship to his wife and three young children who all depend on him." *Id.* at 4 (alterations added).



Dela is the person in the best position to take care of her mother, PSR ¶ 94, and hopes to move her mother back to the United States so that she can continue to provide her with care. Even while she has been on house arrest and a curfew, Dela takes care of her mother by calling her via video calls multiple times daily to make sure she does not feel alone and by making sure that someone is bringing food to her mother and taking care her mother's house. Ex. 5, D. Caulo Letter at 2.

C.    **A Time-Served Sentence Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

The past two and half years of these proceedings—including Dela's time in the MDC and on house arrest—have been sufficient "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). A sentence of time served also is consistent with other sentences given by this Court and others to similarly situated defendants.

1.    **The Time Dela Spent in the MDC and on Home Confinement Has Already Provided "Just Punishment" for Her Offense**

Although pretrial detention and house arrest are not intended to be punitive, that does not stop a defendant from experiencing their time under those restrictions as punishment. Dela has already experienced a form of "just punishment," 18 U.S.C. § 3553(a)(2)(A), for her offense due to the particularly difficult nature of Dela's confinement in the MDC and house arrest. The Court is permitted to, and should, depart downward to account for the time she spent in the MDC during the COVID-19 pandemic and the lengthy and difficult home confinement she has already served. *See, e.g., United States v. Carpenter*, 320 F.3d 334, 345 (2d Cir. 2003).

Dela encountered particularly horrific conditions in the MDC due to the COVID-19 pandemic. She spent the entirety of her time there in the solitary confinement of the SHU. The conditions were made even more difficult by the breakdown of the toilets and the AC/heating units, inmates screaming throughout the night, weekly strip searches, and the guards walking Dela past the dead body of a man who had committed suicide.

Courts in this Circuit have recognized that the harsh and inhumane conditions of the MDC and other jails during COVID-19 are properly considered at sentencing. At the sentencing in *United States v. Morgan*, No. 19-cr-209 (RMB) (S.D.N.Y. 2020), Judge Berman stated that

37

the "unfortunate terrible" conditions and "deficient system" at the MDC were "many times compounded by this coronavirus," noting that it was an "outrage" and that he had serious doubts about the ability of New York City's federal jails to safely house detainees. Sentencing Tr. at 13-15, Dkt. No. 92. Despite calculating the applicable Guidelines sentencing range as 41 to 51 months, the Court sentenced the defendant, who had been remanded to the MDC during the pandemic, to time served with four years' supervised release including three months' home detention. *Id.* at 34-36. This Court similarly stated at around the time Dela was in the MDC that the "the situation at the MDC "is a disgrace," "an ongoing disgrace." *United States v. Rivers*, 18-cr-192 (WFK) (E.D.N.Y. July 27, 2021) (Kuntz, J.) (Dkt. No. 134). This Court sentenced the defendant in that case, who had committed bank robbery, to time served despite a Guidelines range of 70 to 87 months. *Id.*

Dela's house arrest also was significantly more onerous than it would be for a normal defendant. After being released from the MDC, she was in strict home confinement for over a year. In September 2021, despite being on strict home confinement, Dela found a job, and the Court modified her conditions to go to work. Earlier this year, after having no incidents with pretrial in the nearly two years after she had been arrested, the Court modified her conditions to impose a curfew, which still restricts her to her home every evening by 8:00 p.m.

The biggest burden of the last two and a half years for Dela has been that she has been unable to visit or take care of her ailing mother except from afar. In other cases, defendants can spend time in home confinement with family members and do not have to be alone, particularly during a worldwide pandemic. Dela's co-defendants were all released on bail and have been able to live and travel with their families, Dkt. Nos. 160, 202, 208, whereas Dela spent the majority of her time in isolation over 4,000 miles away from her mother and separated from her

boyfriend, ████████████████████████████████████████

████████████████████████████████████████████

Given the uniquely difficult time Dela experienced during her pretrial conditions—

specifically her traumatic experiences in the MDC, that she was alone and over 4,000 miles away

from her mother, and that her freedom was drastically curtailed for two and half years—she has

suffered hardships unlike the typical defendant on house arrest.  Thus, a time-served sentence is

appropriate because the time Dela spent in the MDC and on house arrest have been sufficient "to

reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

### 2.    A Time-Served Sentence Is Consistent with Other Sentences in Comparable Cases

A sentence of time served is consistent with other sentences given by this Court and

others to similarly situated defendants.  For example, as noted, unlike Dela, who was a low-level

assistant acting at the direction of others, the defendant in *Onaga* was an EIP therapist who

submitted fraudulent session notes to the EIP program and made $60,000 in improper benefits as

a result.  *United States v. Ego Onaga*, No. 19-cr-061(WFK) (E.D.N.Y.) (Kuntz, J.) (Dkt. Nos. 89,

93).  This Court sentenced Onaga to two years' probation.  Dkt. No. 93.

In *Scott*, the defendant was convicted of conspiring to defraud investors in a Sandy Hook

Benefit Concert.  *United States v. Scott*, No. 20-cr-051 (WFK), 2023 WL 4758766 (E.D.N.Y.

July 25, 2023) (Kuntz, J.).  ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

39

████████████████████████████████████████████

████████████████████████████████████████████

In *United States v. Pangelinan*, No. 16-cr-1409 (S.D. Cal.) (Dkt. Nos. 537), the defendant served in a similar role to Dela: as a doctor-recruiter. *Id.* The defendant there was a doctor recruiter in "an elaborate and illegal kickback and bribery scheme that bought and sold patients, putting profits ahead of patient medical needs." *Id.* at 12. Unlike Dela, however, the defendant received personally at least $126,808.42 from the unlawful conduct. *Id.* at 5, 20. Noting that, as a doctor recruiter, the defendant was less culpable than the organizers of the scheme, the court sentenced the defendant to time served and two years' supervised release including 10 months of home confinement, despite a Guidelines range of 51 to 63 months' imprisonment. *Id.* at 17.

Dela's participation here—as a low-level personal assistant who did not share in the unlawful profits—is even more limited than the participation of the defendants in *Onaga*, *Scott*, and *Pangelinan*. Beyond these cases, this Court and others have sentenced defendants who were comparably or more culpable than Dela, to non-custodial or time-served sentences:

- *United States v. Nauman*, No. 19-cr-272 (TJM) (N.D.N.Y. 2020): The defendant admitted to fraudulent Medicaid billing practices over a span of three years connected to two medical transportation companies he owned. The Guidelines sentencing range was 6 to 12 months. The court sentenced the defendant to time served (25 days in jail after arrest), supervised release, and restitution of $55,000.

- *United States v. Doyle*, No. 19-cr-0057 (KAM) (E.D.N.Y. 2022): The defendant therapist, who submitted at least 1,000 fraudulent session notes for non-existent therapy sessions resulting in the improper disbursement of at least $100,000 in federal and state funds, was sentenced to a five-year term of probation and to pay restitution despite a Guidelines range of 18 to 24 months imprisonment.

- *United States v. Scopinich*, No. 19-cr-00062 (FB) (E.D.N.Y. 2019): The defendant therapist, who defrauded various government programs over several years, in total reaping more than $34,000 in improper benefits, was sentenced to a two-year term of probation and to pay restitution despite a Guidelines range of 12 to 18 months imprisonment.

40

- *United States v. Beylina*, No. 19-cr-00059 (SJ) (E.D.N.Y. 2019):  The defendant, who was an EIP therapist whose "years-long pattern of fraud resulted in the improper disbursement of approximately . . . $44,535," was sentenced to a five-year term of probation and to pay restitution despite a Guidelines range of 30 to 37 months imprisonment.

- *United States v. Steinberg*, No. 19-cr-00063 (NGG) (E.D.N.Y. 2020):  The defendant, who submitted at least 1,000 fraudulent notes for "non-existent EIP therapy sessions" over a span of three years and reaped more than $105,000 in improper benefits, was sentenced to a two-year term of probation and restitution despite the government calculating the Guidelines range as 18 to 24 months imprisonment.

- *United States v. Williams*, No. 21-cr-603 (VEC) (S.D.N.Y. 2023):  The court sentenced multiple former members of the National Basketball Association ("NBA"), who were charged with defrauding the NBA's health and welfare benefit plan out of $4 million, to time served or non-custodial sentences, including:  Anthony Allen, Shannon Brown, Christopher Douglas Roberts, Jamario Moon, Milton Palacio, Ruben Patterson, Eddie Robinson, and Anthony Wroten.

- *United States v. Chastain*, No. 22-cr-305 (JMF) (S.D.N.Y. 2023):  The defendant, who was the head of product at OpenSea, the largest online marketplace for auctions and sales of non-fungible tokens ("NFTs"), misappropriated confidential business information to secretly purchase NFTs at a profit of $57,115, sentenced to three months' incarceration and three years' supervised release with the first three months to be spent in home detention.

- *United States v. Wilensky*, No. 15-cr-55 (WFK), 2022 WL 715550 (E.D.N.Y. Mar. 10, 2022) (Kuntz, J.):  The defendant therapist "fraudulently signed superbills and patient charts" over three years resulting in losses of over $4 million "directly attributable to Defendant."  The defendant's offense level was 23 (46 to 57 months)—the same as Dela's.  Defense counsel argued that the Court should be lenient because the defendant did not receive any profits from the scheme and cooperated with the government.  Your Honor sentenced the defendant to two years of probation and ordered restitution.

Dela is comparably or less culpable than the defendants in these cases.  Many shared in the profits of the improper conduct, whereas Dela did not.  Unlike these defendants, Dela worked in a call center and as a personal assistant and did not have any decision-making authority.  To avoid unwarranted sentencing disparities, this Court should sentence Dela to time served.

**D.**    **A Time-Served Sentence Would Afford Adequate Specific and General Deterrence**

A time-served sentence is sufficient to "protect the public from further crimes of the defendant" and to afford "adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B), (C). As to protecting the public, Dela is not at risk of reoffending. This case is Dela's first encounter with the criminal justice system. Before the conduct here, she was a law-abiding citizen. She was hired by the wrong people at a vulnerable point in her life when she was desperate to provide care for her mother and herself.

The collateral consequences of Dela's conduct will have a lasting effect on Dela's life. At 34 years old, she will forever be a felon. She already has experienced the difficulty with finding employment based on her status in the criminal justice system. She also has been named as a defendant in a civil suit based on the conduct at issue in this case. *United States* Ex Rel. *Hyun Yu v. NuCare Pharmacy W., LLC et al.*, No. 19-cv-6466 (EK) (E.D.N.Y.). Given that she was not the driving force behind the improper conduct (quite the opposite), that her motivation to work at the company was to provide for her mother, that she experienced exceptionally terrible conditions in the MDC, and that she spent years under house arrest separated from her mother and other family, there is no doubt that this offense is Dela's last.

Recidivism data recently analyzed by the Sentencing Commission shows that offenders with zero criminal history points, such as Dela, have considerably lower recidivism rates than any other offenders. *See* 2023 Amendments in Brief, U.S.S.C. (2023).[11] Among other findings, the Commission concluded that "zero-point" offenders were less likely to be rearrested than "one

---

[11] https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_821R.pdf.

point" offenders (27% compared to 42%), the largest variation of any comparison of offenders within the same Criminal History Category. *Id.* At bottom, Dela is not at risk of reoffending and a time-served sentence is sufficient to protect the public. 18 U.S.C. § 3553(a)(2)(C).

Incarceration also is unnecessary to promote general deterrence. The National Institute of Justice ("NIJ")—an agency of the U.S. Department of Justice—has stated that "sending an individual convicted of a crime to prison isn't a very effective way to deter crime." *See* Five Things About Deterrence, NIJ (May 2016).[12] Courts in this Circuit also have recognized that "every major survey of the evidence" has found that although "certainty of punishment has a deterrent effect, increases in severity of punishments do not yield significant (if any) marginal deterrent effects." *United States v. Velazquez*, No. 16-cr-233 (AKH), 2017 WL 2782037, at *4 (S.D.N.Y. May 26, 2017) (quotation marks omitted). The need for general deterrence is diminished further here due to Dela's minor role in the offense conduct. *See* Fifteen Years of Guidelines Sentencing at 134, U.S.S.C. (Nov. 2004).[13] Any deterrent effect on others is already served by Dela's plea of guilty. A prison sentence will have no further meaningful deterrent effect.

**E.   A Time-Served Sentence Would Allow Dela To Continue ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Rebuilding Her Professional and Personal Life**

A time-served sentence would allow Dela to continue to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, work to provide for herself and her mother, and to start a family. 18 U.S.C. § 3553(a)(2)(D).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[12] https://www.ojp.gov/pdffiles1/nij/247350.pdf.

[13] https://www.ojp.gov/pdffiles1/Digitization/208044NCJRS.pdf.

43



44



## X.    THE COURT SHOULD NOT IMPOSE A FINE

The Court should not impose a fine for several reasons.  First, as recognized by the

Probation Office, Dela cannot pay a fine.  PSR ¶ 81.  Her monthly cash flow is $83.64.  PSR

¶ 78.  She is now working and earning $3,300 per month.  PSR ¶ 71.  She has essentially no

savings.  PSR ¶ 78.  She did not share in any of the profits from the improper conduct.  PSR

¶ 24.  Any fine would impact not only Dela, but also her mother—who Dela hopes to begin

supporting again after these proceedings are concluded.  Her earning potential after this case will

45

also be severely limited due to her status as a felon.  Further, as discussed below, Dela has

already agreed to pay $88,000 to the government as restitution.  Accordingly, the Court should

not impose a fine.

## XI.    THE COURT SHOULD IMPOSE A HYBRID RESTITUTION ORDER

Although restitution is mandatory, the Court has the authority to enter a "hybrid"

restitution order under which Dela's restitution would be capped at an amount reflective of her

minor role and limited earnings.  Dela, through the help of her family, has voluntarily agreed to

pay $88,000 toward restitution, the total amount she earned as salary.  Dela expects that she will

be able to make that payment ahead of sentencing or at the time her cash bail is exonerated.  The

Court should enter a hybrid restitution order and hold that the payment of $88,000 satisfies

Dela's restitution obligation.

The Second Circuit endorsed hybrid restitution orders in *United States v. Yalincak*, 30

F.4th 115 (2d Cir. 2022).  The court recognized that "it might be unfair to impose responsibility

for the entire loss inflicted by a large criminal organization on its more minor members." *Id.* at

122.  Recently, in *United States v. Thompson*, No. 18-cr-33 (NGG), 2022 WL 2186903

(E.D.N.Y. June 1, 2022), Judge Garaufis entered a hybrid order capping a minor participant's

individual liability to $4,000, while noting that the Court expected to impose joint and several

liablity up to the entire loss amount on the more culpable co-defendants, ensuring that the

victims would be made whole.  *Id.* at *5-6 (citing *Yalincak*, 30 F.4th at 122, 125-26).

The Court should do the same here.  According to the government, Dela's co-

conspirators made millions, whereas Dela did not share in the profits.  PSR ¶ 24; S3 Indictment

¶ 25.  Defendant Bishoff has already agreed to forfeiture of $8 million. Dkt. No. 176.  Holding

Dela jointly and severally liable for the full amount could, in effect, bind her to restitution

payments—for money she did not receive—for the rest of her life. To avoid this inequitable result, the Court should fashion a hybrid order that recognizes that the $88,000 restitution payment Dela already has agreed to make—the full amount she earned during her work for the company—satisfies her restitution obligation.[14]

## CONCLUSION

In light of all the above, the most appropriate sentence for Dela is time served. Dela went to Russia to help her mother, and set out to find a job without any intent of engaging in unlawful conduct. After she learned of the illegal conduct, she played a minor role as a personal assistant, did not share in the profits, and had no decision-making authority. At all times, she acted at the direction of her superiors, ███████████████████████████████ ███████████████████████████

Dela has fully accepted responsibility—including by her guilty plea and voluntarily agreeing to make a restitution payment of the full amount she received in salary—and has already experienced "sufficient punishment" for the limited role she played in the offense conduct. Her time in the MDC under awful conditions combined with the isolation of years of house arrest have left an impression that will last forever. ███████████████ ████████████████████████████████ ████. A time-served sentence would also enable her to move on with her life by ██████ ████████████████ and starting her own family.

---

[14] It is not clear whether the government will seek forfeiture in this case. If the government does pursue forfeiture, we respectfully request the opportunity to respond in writing before Ms. Saidazim's sentencing.

Thus, we respectfully request that the Court sentence Dela to time served, impose no fine, and enter a hybrid order capping Dela's restitution to the $88,000 payment she already has agreed to make.

Dated: December 4, 2023          MORVILLO, ABRAMOWITZ
       New York, New York        GRAND, IASON & ANELLO, P.C.

                                 By:  /s/ *Robert J. Anello*
                                 Robert J. Anello
                                 Brian A. Jacobs
                                 Joshua P. Bussen

                                 *Attorneys for Defendant Dela Saidazim*

48